**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

PRATEEK DAVE,                                          :
                                                      :
                  Plaintiff,                          :        Civil Action No.:        08-0856(RC)
                                                      :
         v.                                           :        Re Document No.:         37
                                                      :
DISTRICT OF COLUMBIA                                  :
METROPOLITAN POLICE                                   :
DEPARTMENT,                                           :
                                                      :
                  Defendant.                          :

**MEMORANDUM OPINION**

**GRANTING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; REQUIRING**
**SUPPLEMENTAL BRIEFING CONCERNING PLAINTIFF'S LIBERTY INTEREST DUE PROCESS**
**CLAIM**

## I.  INTRODUCTION

         Plaintiff, Prateek Dave, is an Indian-American former cadet with the District of Columbia's

Metropolitan Police Department ("MPD").  He alleges that MPD failed to advance him and, ultimately,

terminated his employment based on his race and national origin and in retaliation for his prior complaints

of discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*

("Title VII") and 42 U.S.C. § 1981.  Additionally, plaintiff alleges that his termination violated the due

process clause of the Fifth Amendment and 42 U.S.C. § 1983 because he was not given adequate notice

or opportunity to be heard.  Defendant, the District of Columbia, has moved for summary judgment.  For

the reasons set forth below, that motion is GRANTED in part, but the Court requires supplemental

briefing concerning the liberty interest due process claim.

## II.  BACKGROUND

### A. Factual Background

         By letter dated September 15, 2004, MPD informed plaintiff that he had been selected for the

position of Police Officer.  The District of Columbia's Amended Motion for Summary Judgment ("MSJ")

[Docket #37], Exh. J.  Plaintiff was explicitly informed that his first eighteen months would be served in a probationary status, during which his suitability for continued employment as a police officer would be assessed.  *Id.*  Additionally, plaintiff was informed that his appointment could be terminated with no rights to appeal.  *Id.*  Plaintiff accepted the offer and was assigned to recruit class 2004-8.  MSJ, Exh. I.

From the start, plaintiff had difficulty with the physical training.  On October 5, 2004, he failed the assessment test for push-ups, sit-ups and the 1.5 mile run.  MSJ, Exh. Q.  He also failed some of his academic exams initially and on re-examination.  MSJ, Exh. I.

On November 8, 2004, plaintiff was injured during physical training.  MSJ, Exh. A (Plaintiff's Answers to Defendant's First Set of Interrogatories) at 2-3.  Plaintiff alleges that, during a training exercise, Sergeant Timothy Desmond[1] pushed him down a steep and slippery hill, causing him to run down the hill into a parked vehicle resulting in severe injury to his shoulder.  *Id.*  Afterwards, plaintiff alleges that Sgt. Desmond asked him where he was from (which plaintiff interpreted as asking him what country he was from) and advised him not to let the class intimidate him (which plaintiff interpreted as he should not let his classmates intimidate him).  *See* MSJ, Exh. B, Deposition of Prateek Dave (July 15, 2011) ("Depo. Vol. I") at 159-176.  Plaintiff concluded that these statements were discriminatory and was offended by them.  *Id.*

Plaintiff claims that he complained about Sgt. Desmond's actions.  *Id.*  But it is unclear whether plaintiff complained that Sgt. Desmond's actions were discriminatory.  *See* Depo. Vol. I at 172 (plaintiff submitted PD-119 form to Lieutenant Tommy Hayes but does indicate whether it contained allegations of discrimination); MSJ, Exh. C, Deposition of Prateek Dave (July 27, 2011) ("Depo. Vol. II") at 68-69 (plaintiff does not recollect whether the PD-119 referred to discrimination from Desmond), 70 (cannot recall whether he told Sgt. Jones that Desmond was racist); 90 (other than PD-119, plaintiff did not complain about Desmond's discrimination but cannot recall what he put in the document), 144-45 (plaintiff does not recollect telling anyone that Desmond discriminated against him, either verbally, in

---

[1]      This individual is referred to as Mr. Dumonte or DeMont in the deposition testimony.  For purposes of simplicity, the Court refers to the name used in the Amended Complaint (Desmond).

exhibit 154, or in the PD-119), 147-48 (plaintiff may have told Sgt. Jones, but maybe not). This is not an insubstantial issue. Plaintiff has based a large part of his claims on alleged retaliation. But he has not clearly demonstrated that he engaged in protected activities by complaining about discrimination. Without having engaged in protected activity, there can be no actionable retaliation claims. Regardless, because the parties have not raised or briefed this issue, for purposes of resolving this motion, the Court will assume without deciding that plaintiff engaged in protected activity.

Subsequent to his shoulder injury, plaintiff was placed on limited duty for a period of time. Depo. Vol. II at 98. Plaintiff does not challenge the basis of that decision. *Id.* He acknowledges that the decision was based on medical opinions and does not allege that any of the individuals he claimed discriminated against him had any influence on the process. *Id.* at 106-109, 177. But while plaintiff was on limited duty related to his shoulder injury, his classmates continued to progress with their training. *Id.* at 130-33. Thus, by the time plaintiff had returned to full duty status, his classmates had completed many of the training modules plaintiff had not, and the training class had graduated and plaintiff had to be sent to another class. *Id.*

Subsequent to being returned to full duty, plaintiff failed two physical training tests. *Id.* at 155-156; *see also* MSJ, Exh. Q. A third failure would have resulted in termination. *Id.* Although plaintiff was scheduled to take the third physical test, he did not do so because he developed asthma. *Id.* Based on plaintiff's doctor's recommendation (Dr. Varma), plaintiff was again placed on limited duty. *Id.* at 204-205. This again resulted in plaintiff falling behind his classmates with respect to physical training. *Id.* at 211-213.

As a result of his asthma, plaintiff received treatment from Dr. Michael Tsun, M.D. at Northern Virginia Pulmonary and Critical Care Associates. MSJ, Exh. F (Declaration of Michael Tsun, M.D.) ("Tsun Decl.") at ¶ 3. Because of that treatment, on July 21, 2006, Dr. Tsun provided plaintiff with a handwritten note for hand-delivery to the Police and Fire Clinic Associates. Tsun Decl. at ¶ 5. That note stated that plaintiff could go back to full duty, however, Dr. Tsun preferred that plaintiff work indoors if air quality was code orange or red. *Id.*; MSJ, Exh. H at DC 31.

Martin Rosenthal, M.D., is a physician at the Police and Fire Clinic Associates, LLC.  MSJ, Exh. D (Declaration of Martin Rosenthal, M.D.) ("Rosenthal Decl.") at ¶ 2.  In that capacity he provides occupational health services to sworn members of MPD, including plaintiff.  *Id.*  Due to his asthma, plaintiff had been on non-performance of duty status that prevented him from performing the full duties of an MPD cadet from February 1, 2006 through August 2, 2006.  *Id.* at ¶ 4.  On August 1, 2006, Dr. Rosenthal received a hand-written note from Dr. Tsun indicating that plaintiff could return to full duty status.  *Id.* at ¶ 5.  Dr. Rosenthal signed the document he received.  *Id.*; MSJ, Exh. H at DC 32.  Dr. Rosenthal believed the document appeared altered because there were large gaps between numerous words in the document.  *Id.*

The next day, on August 1, 2006, plaintiff saw Michelle Smith Jefferies, M.D., a consultant at the Police and Fire Clinic, for an Initial Disability Evaluation pertaining to his asthma.  MSJ, Exh. E (Declaration of Michelle Smith-Jefferies, M.D.) ("Jefferies Decl.") at ¶¶ 3-6.  As part of this evaluation, Dr. Jefferies examined the note from Dr. Tsun.  *Id.* at ¶¶ 6-8.  Dr. Jefferies also considered the note suspicious and obtained plaintiff's consent to talk directly to Dr. Tsun.  *Id.*  Immediately after the evaluation, Dr. Jefferies telephoned Dr. Tsun who read the contents of the note he wrote to Dr. Jefferies.  *Id.* at ¶ 9.  Dr. Tsun also faxed a copy of the note he wrote to Dr. Jefferies which included the restrictions set forth above.  *Id.*  Dr. Jefferies also spoke to Dr. Rosenthal and confirmed that the note had not been altered between the time he accepted delivery the previous day and the evaluation.  *Id.*  Based on her strong suspicion that plaintiff had altered Dr. Tsun's handwritten note in an attempt to return to full duty, Dr. Jefferies submitted both versions of Dr. Tsun's handwritten note and a memorandum detailing what had taken place to Captain Michael Eldridge, MPD's Director of the Medical Services Section, for further review.  *Id.*  at ¶ 10; MSJ, Exh. H at DC 19.

As a result of the referral from Dr. Jefferies, MPD initiated an investigation concerning the allegation that plaintiff presented a falsified medical record to the doctors at the Police and Fire Clinic in an effort to maintain his employment.  MSJ, Exh. H at DC 10-34.  During the investigation, plaintiff denied he altered the document.  *Id.*  at DC 20-21.  He stated then (and through this litigation) that he

4

provided the Police and Fire Clinic the handwritten note that Dr. Tsun's office provided to him.  *Id.*;

Depo. Vol. II at 241-245.[2]  Drs. Rosenthal and Jefferies cooperated with the investigation.  Rosenthal

Decl. at ¶ 8; Jefferies Decl. at ¶ 11.  In the investigative report, Lieutenant Hayes concluded that plaintiff

altered the document and recommended that he be cited for Adverse Action consistent with MPD

guidelines.  MSJ, Exh. H at DC 15.  By letter dated September 19, 2006, the Director of MPD's Institute

of Police Science concurred in the report's findings and recommended that plaintiff be terminated on the

basis of the altered record.  *Id.* at DC 11.  On September 21, 2006, that recommendation was concurred

with and forwarded to the Chief of Police.  *Id.* at DC 10.  By letter dated September 26, 2006 (served

September 27, 2006), Chief of Police Ramsey notified plaintiff that he was terminated effective October

13, 2006.  *Id.* at DC 2 & 7.  The letter gave no reason for the termination.  *Id.*

## B.  Procedural History

On October 23, 2006, plaintiff submitted an administrative complaint to the District of

Columbia's Office of Human Rights.  MSJ, Exh.  L at DC 2-10.  In it, he complained about race and

disability discrimination concerning his discharge and discipline.  *Id.*   More specifically, plaintiff

complained about his shoulder injury making him unable to properly do push-ups and being failed on that

basis.  *Id.*  Plaintiff further complained that he was not given proper training and, after developing asthma,

he was terminated because he could not perform his police duties.  *Id.*  By letter dated October 25, 2006,

the Office of Human Rights informed plaintiff that his administrative complaint had been dismissed for

failure to state a claim upon which relief may be granted.  *Id.* at DC 1.

On March 13, 2007, plaintiff submitted an intake questionnaire to the Equal Employment

Opportunity Commission ("EEOC").  Plaintiff's Memorandum of Points and Authorities in Opposition to

Defendant's Amended Motion for Summary Judgment [Docket #42] ("Opposition"), Exh. B.  In that

Questionnaire, plaintiff asserted race and disability discrimination concerning lack of training and his

---

[2]     In the investigative report, Lieutenant Tommie Hayes states that, a few days subsequent to giving his official statement, the plaintiff came to his office and confessed to altering the medical record.  MSJ, Exh. H at DC 15.  Although Plaintiff has not expressly denied this, he does not concede that he confessed in this litigation.

termination. *Id.*  On May 25, 2007, plaintiff submitted a Charge of Discrimination to the EEOC.

Opposition, Exh. C.  In that Charge, however, he only alleged disability discrimination.  *Id.*

 Plaintiff filed the current action on May 19, 2008.  After plaintiff received a full and fair

opportunity to take discovery, defendant moved for summary judgment.  For the reasons set forth below,

that motion will be granted in part.

### III. LEGAL STANDARD FOR A MOTION FOR SUMMARY JUDGMENT

 Summary judgment may be granted when "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  A fact is "material" if it is capable of affecting the substantive outcome of the

litigation.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is "genuine" if

sufficient evidence exists such that a reasonable jury could return a verdict for the non-moving

party.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007).

 The principal purpose of summary judgment is to streamline litigation by disposing of

factually unsupported claims or defenses and determining whether there is a genuine need for

trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  The moving party bears the initial

responsibility of identifying those portions of the record which demonstrate the absence of any

genuine issue of material fact.  *Id.* at 323; Fed. R. Civ. P. 56(c)(1)(A) (noting that the movant

may cite to "depositions, documents, electronically stored information, affidavits or declarations,

. . . admissions, interrogatory answers, or other materials").  In response, the non-moving party

must similarly designate specific facts in the record that reveal a genuine issue that is suitable for

trial.  *Celotex*, 477 U.S. at 324.  On a motion for summary judgment, the court must "eschew

making credibility determinations or weighing the evidence," *Czekalski v. Peters*, 475 F.3d 360,

363 (D.C. Cir. 2007), and all underlying facts and inferences must be analyzed in the light most

favorable to the non-moving party, *Anderson*, 477 U.S. at 255.  Nevertheless, conclusory

assertions offered without any evidentiary support do not establish a genuine issue for trial.
*Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

## IV. ANALYSIS

Plaintiff alleges that MPD failed to advance him and, ultimately, terminated his employment based on his race and national origin and in retaliation for his prior complaints of discrimination in violation of Title VII and 42 U.S.C. § 1981. Additionally, plaintiff alleges that his termination violated the due process clause of the Fifth Amendment and 42 U.S.C. § 1983. For the reasons set forth below, all of these claims fail except that the Court requires supplemental briefing concerning plaintiff's liberty interest due process claim.

### A. Plaintiff's Title VII Claims Are Untimely or Unexhausted

In its Motion for Summary Judgment, the District of Columbia argues that plaintiff's Title VII claims are untimely because plaintiff failed to file his EEOC charge within 30 days of being informed by DC's Office of Human Rights that his administrative complaint had been dismissed. MSJ at 13-14. Ignoring the plain language of the relevant statute, plaintiff responds that his Title VII claims are, in fact, timely because he filed his charge directly with the EEOC on May 25, 2007. Opposition at 7-8. Plaintiff's Title VII claims fail because they are either untimely or unexhausted.

The EEOC has broad authority to enforce Title VII's mandates, and the EEOC has established detailed procedures for the administrative resolution of discrimination complaints. *Bowden v. United States*, 106 F.3d 433, 437 (D.C. Cir. 1997). "Complainants must timely exhaust these administrative remedies before bringing their claims to court." *Id.* In particular, Title VII requires that plaintiffs file an EEOC charge within a certain time period of the allegedly unlawful act. 42 U.S.C. § 2000e-5(e)(1). Specifically, the statute states:

(e) Time for filing charges; time for service of notice of charge on respondent; filing of charge by Commission with State or local agency; seniority system

(1) A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred and notice of the charge (including the date, place and circumstances of the alleged unlawful employment practice) shall be served upon the person against whom such charge is made within ten days thereafter, except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred, *or within thirty days after receiving notice that the State or local agency has terminated the proceedings under the State or local law, whichever is earlier*, and a copy of such charge shall be filed by the Commission with the State or local agency.

42 U.S.C. § 2000e-5(e) (emphasis added).

Plaintiff did not file his EEOC charge within 30 days of being informed by the DC Office of Human Rights that his administrative complaint had been dismissed.  Plaintiff was informed of the dismissal on or about October 25, 2006, MSJ, Exh. L, but did not file his EEOC charge until May 25, 2007, Opposition Exh. C.  Although plaintiff argues that the case cited by the District of Columbia is inapposite, he does not explain why the plain language of the statute does not make his claim untimely.[3]

Instead, plaintiff argues that his filing of an EEOC charge on May 25, 2007 satisfies any exhaustion problem.[4]  But, even putting aside the plain language of the statute, the EEOC charge

---

[3]     Perhaps if plaintiff had filed his EEOC charge within 180 days of his termination (October 13, 2006), he could have argued that the two prongs of the statute work in the alternative.  *See Rucker v. Western Elec. Co.*, 521 F. Supp. 986, 988 (M.D. Fla. 1981) (a plaintiff may file a charge within 30 days of the local agency dismissal *or* within 180 days of the allegedly discriminatory act).  But he did not file his EEOC charge until May 25, 2007, well past the 180-day mark of approximately April 11, 2007.

[4]     The DC Office of Human Right's letter does not advise plaintiff that, because of the dismissal, he had 30 days to file an EEOC charge.  MSJ, Exh. L.  Perhaps plaintiff could have argued that he was entitled to equitable tolling on that basis.  *See generally Gates v. Georgia-Pacific Corp.*, 492 F.2d 292, 295 (9th Cir. 1974).  But equitable tolling is to be sparingly used and poses a high burden to meet.  And plaintiff has not requested equitable tolling, much less proven entitlement to it.

only claims disability discrimination.  Opposition, Exh. C.  However, the disability claims in this

case have previously been dismissed. [Docket #17]  So, whatever effect the filing of the EEOC

charge had on the exhaustion of plaintiff's administrative remedies, it did not preserve the Title

VII race, national origin, and retaliation claims that remain before this Court.  As such, they must

be dismissed.[5]

### B.  Plaintiff's Due Process Claims

Plaintiff claims that he was terminated in violation of his due pro process rights because

he was not given adequate notice or opportunity to be heard.  He brings this claim both directly

under the Fifth Amendment of the Constitution and pursuant to 42 U.S.C. § 1983.  Because

plaintiff fails to demonstrate that he had a protected property interest in his continued

employment, that portion of his due process claim fails.  However, because the parties have

inadequately briefed the liberty interest portion of plaintiff's due process claims, the Court will

order supplemental briefing on this claim only.

### 1.       Property Interest

In its motion for summary judgment, the District of Columbia argues that plaintiff had no

property interest in his continued employment because he was a probationary employee.  MSJ at

20-21.  Plaintiff attempts to shift the burden of proof by arguing that the "District provides no

proof that Dave was a probationary employee."  Opposition at 13-14.  Plaintiff claims that he

was told he would be a probationary employee for eighteen months when he was hired, but he

was terminated beyond the eighteen month period.  *Id.*  But as set forth below, plaintiff has failed

to prove that, despite having been a probationary employee for more than eighteen months, he

---

[5]       Regardless, even had plaintiff exhausted these claims, they would fail on the merits.  *See infra* pp. 16-19.

had any legitimate expectation of continued employment.  Thus, he has failed to demonstrate that he had a property interest in his position at MPD.

The Due Process Clause of the Fifth Amendment provides that no person shall be deprived of life, liberty, or property without due process of law. U.S. Const. amend. V.  As plaintiff recognized in his Opposition, in order to establish a Fifth Amendment deprivation of property claim based on termination from employment, the Court must engage in the "familiar two-part inquiry."  First, a plaintiff must demonstrate that he has a "property interest in continued employment."  *Orange v. District of Columbia*, 59 F.3d 1267, 1274 (D.C. Cir.1995) (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985)).  Property interests "'are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'" *Id.* (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)) (property interests are created and circumscribed "by existing rules or understandings that stem from an independent source such as state law - rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."); *see also Perry v. Sindermann*, 408 U.S. 593, 604 (1972) (the policies and practices of an institution can create a protected property interest in government employment).  "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it.  He must have more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it." *Roth*, 408 U.S. at 577 (1972).  Only if plaintiff has demonstrated a property interest in continued employment, must the Court determine whether he was deprived of the process he was due. *Orange*, 59 F.3d at 1273-74 (citing *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982)).

As the D.C. Circuit has made clear, an employee's status as a probationary employee poses a large hurdle to clear in order to establish a property interest. *Piroglu v. Coleman*, 25 F.3d 1098, 1104 (D.C. Cir. 1994).  This is so because probationary employees are ordinarily considered employees at will and "'[t]hose who are terminable at will have no property interest because there is no objective basis for believing that they will continue to be employed indefinitely.'" *Id.* (quoting *Hall v. Ford*, 856 F.2d 255, 265 (D.C. Cir. 1988)).  It is undisputed that plaintiff was hired as a probationary employee and was told that his probationary status would last for a period of eighteen months.  MSJ, Exh. J.  But the question is what legitimate expectation of continued employment did plaintiff have once the eighteen month period expired? Although plaintiff may have had an abstract desire for continued employment, he had no property interest in such continued employment because no state law, rules or understandings provided him such.

First, plaintiff has pointed to no statute, regulation, or rule indicating that he was no longer a probationary employee and was entitled to any job protections simply because the eighteen-month period had elapsed.  To the contrary, the applicable provision of the personnel manual (Code of D.C. Municipal Regulations) clearly indicates that, for entry-level police officers serving eighteen-month probationary periods, the probationary period is extended by a day "for each workday that the employee is not performing the full range of the police duties of the position to which assigned, including, but not limited to, periods of sick leave or non-contact status . . . . "  8 D.P.M. § 813.9(b).  As set forth above, due to his shoulder injury and asthma, plaintiff could not perform the full range of police duties for significant periods of time.  Thus, despite being an MPD cadet for more than eighteen months, plaintiff's eighteen-month probationary period was extended and, consequently, he was still a probationary employee at the

time of his termination.  Plaintiff's Opposition brief does not address this provision nor does he

explain how he could have a different understanding in light of it.

Second, plaintiff points to no policies or understandings that would indicate that,

regardless of the applicable personnel manual provision, an expectation of continued

employment for someone in his position had built up over time.  To the contrary, the letter the

Fraternal Order of Police sent on plaintiff's behalf to challenge his termination made clear that it

too understood that plaintiff had no property interest in his position.  MSJ, Exh. K at DC 4

(noting its understanding that plaintiff was a probationary employee at the time of his

termination because his probationary status had been extended because he was unable to perform

his full range of police duties).

Accordingly, because plaintiff has failed to point to existing rules or understandings that

stem from District of Columbia law, rules or understandings that support his claims to continued

employment, he has not shown that he possessed a property interest in his position as an MPD

cadet.  Thus, he could be terminated without any process due to him and his claims based on an

alleged deprivation of a property interest without due process of law fail.

### 2. Liberty Interest

In his Amended Complaint, plaintiff alleges that he had a liberty interest in his

employment and the manner in which he was terminated without notice or opportunity to be

heard stigmatized him and damaged his reputation and foreclosed him from taking advantage of

future employment opportunities.[6]  The District of Columbia's motion for summary judgment

---

[6]     Plaintiff requests a number of forms of relief including reinstatement and backpay.  Amended
Complaint at Counts III & IV.  However, it appears that his only available remedy may be a name-
clearing hearing.  *Doe v. Dep't of Justice*, 753 F.2d 1092, 1102 (D.C. Cir. 1985)("Doe's liberty interest
implicates her post-employment reputation rather than any right to continued employment with the
Department; if Doe can demonstrate that the DOJ harmed her professional standing without providing the
proper procedural protections, her remedy is a 'name-clearing' hearing.").

fails to address this claim and plaintiff re-asserted this claim in its Opposition.  Despite the District of Columbia not filing a reply brief to address this claim, the Court will require supplemental briefing on this claim because it is unclear that plaintiff's liberty interest claim should go to trial.[7]

      Under the precedents of the Supreme Court and the D.C. Circuit, a government employee's due process rights are implicated when a firing or demotion is coupled with a defamatory official statement, *see Mosrie v. Barry*, 718 F.2d 1151, 1161 (D.C. Cir. 1983), or when an adverse employment action (considered somewhat more broadly) is combined with "a stigma or other disability that foreclose[s] [the plaintiff's] freedom to take advantage of other employment opportunities," *O'Donnell v. Barry*, 148 F.3d 1126, 1140 (D.C. Cir. 1998) *(*quoting *Roth*, 408 U.S. at 573).  The first case is known as a "reputation-plus" claim; "it presumably rests on the fact that official criticism will carry much more weight if the person criticized is at the same time demoted or fired."  *Id.*; *see also Paul v. Davis*, 424 U.S. 693, 710 (1976) (reading *Roth* to hold that "defaming an individual in the course of declining to rehire him could entitle the person to notice and an opportunity to be heard as to the defamation," but not to suggest that "a defamation perpetrated by a government official but unconnected with any refusal to rehire would be actionable" as a due process violation).  The second case goes by the name of "stigma or disability," because "it does not depend on official speech, but on a continuing stigma or disability arising from official action."  *O'Donnell*, 148 F.3d at 1140.  A plaintiff may not "sue purely on the basis of the stigma associated with being fired; the Court found in *Paul v. Davis*, that stigma alone is not actionable, without a showing that a 'right or status previously

---

[7]     The District of Columbia moved for an extension of time in order to file a reply brief based, in part, on the "complexity" of the case. [Docket # 43]  Despite being granted the extension and the case's complexity, the District of Columbia failed to file a reply brief.

recognized by state law' has been 'distinctly altered or extinguished.'" *Id.* at 1139 (quoting *Paul*, 424 U.S. at 711) (internal citations omitted).

Plaintiff's termination letter did not state the reason for plaintiff's termination.  MSJ, Exh. H at DC 2.  Although plaintiff was terminated for misconduct, the District did not make this information public.  In fact, plaintiff claims that, until this litigation, he was unaware that the termination was based on his misconduct.  Opposition at 8-9.  These facts seem problematic for plaintiff's reputation-plus claim.  *See, e.g.*, *Harrison v. Bowen*, 815 F.2d 1505, 1518 (D.C. Cir. 1987) ("In Harrison's case, however, there was no publication of the reasons for the dismissal, and thus no stigmatic harm."); *Mazaleski v. Treusell*, 562 F.2d 701,712-14 (D.C. Cir. 1977) (requiring public dissemination of allegations of misconduct); *De Sousa v. Dep't of State*, 840 F. Supp. 2d 92, 110-11 (D.D.C. 2012) (reputation-plus claim fails because government never spread derogatory information about plaintiff).

Moreover, plaintiff has not presented facts indicating that his termination was accompanied with a change of legal status, beyond a disadvantage or impediment, that forecloses his freedom to take advantage of other employment opportunities.  *Mazaleski*, 562 F.2d at 713; *De Sousa*, 840 F. Supp. 2d at 11-12 (plaintiff's "stigma or disability" theory fails because she has not alleged any official government action that has automatically barred her from a specific set of positions within the government or generally blocked her from pursuing employment in her chosen field of interest).  In fact, at the time of his deposition, plaintiff was gainfully employed as a private security officer in a federal government building.  Depo. Vol. I at 54-55.

Accordingly, for the reasons set forth above, the Court is skeptical of plaintiff's liberty interest claim.  However, because the parties have not adequately briefed the issues, the Court will require supplemental briefing on only this claim.

### C.  Plaintiff's Discrimination & Retaliation Claims Fail

Plaintiff alleges that he was discriminated against on the basis of his race and national origin when he was denied certain training and held back in advancement during his cadet tenure and, ultimately, terminated.  He brings retaliation claims on the same basis.  He has brought these discrimination and retaliation claims pursuant to Title VII and 42 U.S.C. § 1981.  As set forth above, plaintiff's Title VII claims are untimely or unexhausted.  And, as set forth below, his claims pursuant to 42 U.S.C. § 1981 fail on the merits.[8]

Section 1981 provides:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981.  But before the merits of plaintiff's discrimination and retaliation claims can be assessed, two preliminary issues must be addressed.

First, "[a] cause of action under § 1981 can be brought when a plaintiff has suffered an injury flowing from the racially motivated breach of his contractual relationship with another party."  *Hamilton v. District of Columbia*, 720 F. Supp. 2d 102, 113-14 (D.D.C. 2010).  However, a plaintiff may not bring a claim against a government municipality directly under § 1981; instead, it must be brought pursuant to 42 U.S.C. § 1983.  *Jett v. Dallas Independent School Dist.*, 491 U.S. 701 (1989).[9]  As a result, a plaintiff must demonstrate that a violation of §

---

[8]     Even if plaintiff's Title VII claims were timely and had been properly exhausted, they too would fail on the merits for the same reasons that his 42 U.S.C. § 1981 claims fail.

[9]     Plaintiff's Amended Complaint raises discrimination and retaliation claims directly pursuant to 42 U.S.C. § 1981.  Amended Complaint, Count II.  And his 42 U.S.C. § 1983 claims pertain only to due process claims.  Amended Complaint, Count IV.  However, because the District of Columbia has not raised this issue in its motion for summary judgment, the Court will liberally interpret plaintiff's § 1983 claims to also encompass the § 1981 discrimination and retaliation claims.

1981 "'was caused by a custom or policy within the meaning of *Monell* and subsequent cases.'" *Hamilton*, 720 F. Supp. 2d at 114 (quoting *Jett*, 491 U.S. at 735-36).[10]  A plaintiff "can establish that a custom or policy of the District violated [his] constitutional rights by demonstrating (1) 'the explicit setting of a policy by the government,' (2) 'the action of a policy maker within the government,' (3) 'the adoption through a knowing failure to act by a policy maker of actions by his subordinates that are so consistent that they have become custom,' or (4) 'the failure of the government to respond to a need (for example, training of employees) in such a manner as to show deliberate indifference to the risk that not addressing the need will result in constitutional violations.'"  *Hamilton v. District of Columbia*, 852 F. Supp. 2d 139, 149-50 (D.D.C. 2012) (quoting *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003)); *see also Dickerson v. District of Columbia*, 806 F. Supp. 2d 116, 120 (D.D.C. 2011).

With respect to plaintiff's termination claim, that action was taken directly by the Chief of Police.  MSJ, Exh. H at DC 2.  "[T]he action of a policy maker within the government" is enough to establish a municipal policy.  *Baker*, 326 F.3d at 1306.  "It does not matter that the policymaker may have chosen 'a course of action tailored [only] to a particular situation and not intended to control decisions in later situations'; if the decision to adopt that particular course of action is intentionally made by the authorized policymaker, 'it surely represents an act of official government "policy"' and 'the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly.'"  *Bd. of Cnty. Com'rs v. Brown*, 520 U.S. 397, 418 (1997) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986)) (alteration in original).

---

[10]     The amendments to 42 U.S.C. § 1981 pursuant to the 1991 Civil Rights Act did not change the analysis set forth in *Jett*. *Sledge v. District of Columbia*, – F. Supp. 2d –, 2012 WL 2389992 (D.D.C. 2012).

Thus, with respect to the termination claim, plaintiff has met the *Monell* standard based on the action of a policy maker within the government.

But, with respect to the training and advancement claims, plaintiff has not clearly indicated what custom or policy caused his alleged harm.  To the contrary, he challenges actions that appear to be unique to his situation.  Nor has he alleged that such actions were undertaken by the Chief of Police or any other policy maker.  *See Hamilton*, 852 F. Supp. 2d at 150 (plaintiffs' allegations of actions taken by their immediate supervisor, Sergeant Proctor, as well as Deputy Fire Chief Gary Palmer fail to meet the *Monell* standard because neither official has final policymaking authority under state law).  Neither has he established that the District was deliberately indifferent to his purported discriminatory treatment.  To the contrary, nowhere has he alleged that, prior to his termination, he complained to superiors about discriminatory or retaliatory treatment concerning his training/advancement.[11]  Finally, plaintiff argues that it was widespread knowledge among recruits and officers that MPD had issues related to discriminatory terminations (but no word concerning training) and that such discriminatory actions had become so widespread as to have become custom.  Opposition at 17.  But such generalized claims without reference to specific facts are insufficient at the summary judgment stage.  *Patterson v. County of Oneida, New York*, 375 F.3d 206 (2d Cir. 2004) (claim that discrimination against African-Americans was so widespread as to permit inference of policy or custom fails because it is too conclusory, unsupported with specific facts, and based on third-party hearsay); *see also Hamilton*, 852 F. Supp. 2d at 152 (fact that two former employees have filed similar suits does not help plaintiff because plaintiff failed to link discriminatory policy involved in prior suits to

---

[11]     To the extent that plaintiff complained about discrimination at all prior to his termination (and, as set forth above, that is not clear), it only concerned the actions of Sgt. Desmond during the specific training exercise on the hill.

his own allegations of harm).  Accordingly, the District of Columbia could not be held liable under §§ 1981/1983 for training/advancement claims.

Second, the District of Columbia argues that plaintiff cannot bring a claim pursuant to § 1981 because, as a public employee, plaintiff's employment is governed by applicable statutes and regulations, not contract.  MSJ at 26-29.  However, that argument fails for two reasons. Courts in this District have held that, just as at-will employees may bring claims pursuant to § 1981, public employment does not preclude a § 1981 claim.  *Kennedy v. District of Columbia*, 519 F. Supp. 2d 50, 59-61 (D.D.C. 2007); *see also Wilk v. District of Columbia*, 730 F. Supp. 2d 20, 23 n.3 (D.D.C. 2010).  Moreover, a claim may be brought pursuant to § 1981's full and equal benefits clause, not just its make and enforce contracts clause.  *Mazloum v. District of Columbia*, 522 F. Supp. 2d 24, 37-39 (D.D.C. 2007).  Accordingly, the Court will address plaintiff's discrimination and retaliation claims on the merits.

### 1.  Plaintiff's Termination Claim Fails

In assessing discrimination and retaliation claims under § 1981, courts utilize the familiar *McDonnell Douglas* burden-shifting paradigm utilized in Title VII cases.  *See, e.g.*, *Berger v. Iron Workers Reinforced Rodmen Local 201*, 843 F.2d 1395, 1413 n.7 (D.C. Cir. 1988); *Jenkins v. Nee*, 640 F. Supp. 2d 47, 49 (D.D.C. 2009).   Generally, to prevail on a claim of discrimination or retaliation under Title VII, a plaintiff must follow a three-part burden-shifting analysis known as the *McDonnell Douglas* framework.  *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003); *Taylor v. Solis*, 571 F.3d 1313, 1320 n.* (D.C. Cir. 2009) (observing that "[r]etaliation claims based upon circumstantial evidence are governed by the three-step test of *McDonnell Douglas Corp. v. Green*"); *Morgan v. Fed. Home Loan Mortgage Corp.*, 328 F.3d 647, 651 (D.C. Cir.

2003) (applying the *McDonnell Douglas* framework to a Title VII retaliation claim).  The

Supreme Court explained the framework as follows:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination.  Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection" . . . .  Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination . . . .  The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.

*Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981) (internal citations omitted)

(quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).

To establish a prima facie case of race discrimination under Title VII (and thus under §

1981), the plaintiff must show that "(1) [he] is a member of a protected class; (2) [he] suffered an

adverse employment action; and (3) the unfavorable action gives rise to an inference of

discrimination."  *Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999); *see also Stewart v.*

*Ashcroft*, 352 F.3d 422, 428 (D.C. Cir. 2003); *Carroll v. England*, 321 F. Supp. 2d 58, 68

(D.D.C. 2004).  "The burden of establishing a prima facie case of disparate treatment is not

onerous."  *Burdine*, 450 U.S. at 253.  If the plaintiff establishes a prima facie case, a presumption

then arises that the employer unlawfully discriminated against the employee.  *Id*. at 254.  To

rebut this presumption, the employer must articulate a legitimate, nondiscriminatory reason for

its action.  *Id*.  The employer "need not persuade the court that it was actually motivated by the

proffered reasons."  *Id*.  Rather, "'[t]he defendant must clearly set forth, through the introduction

of admissible evidence,' reasons for its actions which, if believed by the trier of fact, would

support a finding that unlawful discrimination was not the cause of the employment action."  *St.*

*Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993) (quoting *Burdine*, 450 U.S. at 254-55).

To establish a prima facie case of retaliation, a plaintiff must show that (1) he engaged in a statutorily protected activity, (2) a reasonable employee would have found the challenged action materially adverse, and (3) there existed a causal connection between the protected activity and the materially adverse action. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67-69 (2006); *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009). In the retaliation context, the term "adverse action" "encompass[es] a broader sweep of actions than those in a pure discrimination claim." *Baloch v. Kempthorne*, 550 F.3d 1191, 1198 n.4 (D.C. Cir. 2008). Thus, "[r]etaliation claims are 'not limited to discriminatory actions that affect the terms and conditions of employment' and may extend to harms that are not workplace-related or employment-related so long as 'a reasonable employee would have found the challenged action materially adverse.'" *Id.* (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64, 68 (2006)). The plaintiff's burden is not great: he "need only establish facts adequate to permit an inference of retaliatory motive." *Forman v. Small*, 271 F.3d 285, 299 (D.C. Cir. 2001).

If the employer successfully presents a legitimate, non-discriminatory or non-retaliatory reason for its actions, the presumption raised by the prima facie case is rebutted and drops from the case. *St. Mary's Honor Ctr.*, 509 U.S. at 507; *Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) (noting that "the prima facie case is a largely unnecessary sideshow"). Upon such a showing by the defendant, the district court need resolve only one question: "Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory [or non-retaliatory] reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, [] national origin [or retaliation]?" *Brady*, 520 F.3d at 494. The court must consider whether the jury could "infer discrimination [or retaliation] from the plaintiff's prima

facie case and any other evidence the plaintiff offers to show that the actions were discriminatory [or retaliatory] or that the non-discriminatory [or non-retaliatory] justification was pretextual." *Smith v. District of Columbia*, 430 F.3d 450, 455 (D.C. Cir. 2005) (quoting *Murray v. Gilmore*, 406 F.3d 708, 713 (D.C. Cir. 2005)).  The court should assess the plaintiff's challenge to the employer's explanation in light of the totality of the circumstances of the case.  *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1291 (D.C. Cir. 1998) (en banc).

Plaintiff was an Indian-American (Asian) police cadet who was terminated from his position.  Plaintiff has also claimed that he complained of discriminatory treatment and was terminated because of such protected activity.  But the District of Columbia has set forth a legitimate non-discriminatory, non-retaliatory basis for the dismissal, *i.e.*, plaintiff was terminated because he altered a medical record and, during the investigation, denied having done so.  MSJ, Exh. H at DC 10.  Thus, the Court turns to the only relevant question: has plaintiff produced sufficient evidence for a reasonable jury to find that this reason for the termination was not the actual reason and that, instead, discrimination or retaliation was.  On the record presented, the Court finds that a reasonable jury could not find in plaintiff's favor.

 Plaintiff challenges the District of Columbia's non-discriminatory, non-retaliatory basis for his termination as pretextual.  Opposition at 9-10.  In this regard, he offers three arguments. Each of them fail.

First, plaintiff argues that MPD's shifting justification for his termination is probative of pretext.  Opposition a 9.  But MPD's justification for the termination has not shifted.  The justification for the termination was simply not previously communicated to him.  Although the termination letter did not contain a reason for the termination, the contemporaneous paperwork leading up to the termination is clear: the basis for the determination was plaintiff's altering of

the medical record and his denial of such during the investigation.  MSJ, Exh. H.  Plaintiff's

Opposition does not address this undisputed chronology.[12]  Accordingly, there is no record of

any shifting justification.

Second, plaintiff argues that he has steadfastly maintained that the falsification

allegations are false.  Opposition at 9-10.  But that is beside the point.  In a situation such as that

presented, the question is not whether plaintiff altered the document or falsely denied he did, but

whether MPD honestly and reasonably believed that the underlying misconduct occurred.

*Brady*, 520 F.3d at 496 ("The question is not whether the underlying sexual harassment occurred;

rather, the issue is whether *the employer honestly and reasonably believed* that the underlying

sexual harassment incident occurred.");[13] *Musick v. Salazar*, 839 F. Supp. 2d 86, 97-98 (D.D.C.

2012) (same); *Asewole v. PSI Services*, 798 F. Supp. 2d 57, 63 n.4 (D.D.C. 2011) (same);

*Dunning v. Quander*, 468 F. Supp. 2d 23, 32 n.10 (D.D.C. 2006) (declining to review *de novo*

results of investigation because court is not to act as super-personnel department).  Although

plaintiff implies that the investigation was inadequately conducted, he has presented no evidence

---

[12]     Although plaintiff notes that the basis for the termination is not mentioned in the D.C. Office of
Human Rights or the EEOC documentation, Opposition at 9, the record before the Court does not indicate
that MPD provided *any* basis for the termination.

[13]     In *Brady*, the Circuit specifically rejected what plaintiff attempts to do here: create a dispute of
fact by merely denying that the underlying events occurred.  *Brady*, 520 F.3d at 496 ("Allowing Brady to
end-run summary judgment in these circumstances would create significant practical problems.
Employers obviously have to resolve factual disagreements all the time in order to make employment
decisions regarding hiring, promotion, discipline, demotion, firing, and the like. In many situations,
employers must decide disputes based on credibility assessments, circumstantial evidence, and
incomplete information. But Brady's argument would mean that every employee who is disciplined,
demoted, or fired for alleged misconduct could sue for employment discrimination based on race, color,
religion, sex, or national origin and-merely by denying the underlying allegation of misconduct-
automatically obtain a jury trial. Brady cites no support for that proposition, which would wreak havoc on
district courts' orderly resolution of employment discrimination cases and improperly put employers in a
damned-if-you-do, damned-if-you-don't posture when addressing disciplinary issues in the workplace.").

that MPD did not honestly believe in its conclusion.  The matter investigated was straight-forward and narrow.  The fact that the investigation was short does not impugn its reasonableness.  *Brady*, 520 F.3d at 496 (rejecting claim that employer over-reacted and adopted hair-trigger approach to the reported incident).  Although plaintiff made a general denial that he altered the medical record, he had the greatest motive to do so in order to be returned to full duty, a number of unbiased medical professionals supported the conclusion that he did alter the document, and no other plausible explanation has been proffered for how an indisputably altered doctor's note was presented to the Clinic.  Simply put, it was reasonable for MPD to rely on the investigation's conclusions.

Finally, plaintiff argues that the investigation was tainted because the person who led the investigation, Lt. Hayes, was also the person who had previously ignored plaintiff's complaints about the incident with Sgt. Desmond in which plaintiff injured his shoulder.  Opposition at 10. Thus, plaintiff claims that Sgt. Desmond would have been biased against plaintiff calling the objectivity and, hence, the validity of the investigation into question.  But plaintiff does not challenge the motives or credibility of any of the witnesses to the events.  In fact, the witnesses were unbiased medical professionals who had nothing to do with the Sgt. Desmond incident. And plaintiff points to no unreasonable conclusions reached by Lt. Hayes based on the straight-forward evidence.  Thus, no reasonable juror would infer discrimination or retaliation based on plaintiff's attenuated and poorly-developed theory of Lt. Hayes's ill motive.

Accordingly, plaintiff has failed to demonstrate that the legitimate non-discriminatory, non-retaliatory reason for his termination was pretextual.  Because plaintiff has failed to produce sufficient evidence for a reasonable jury to find that MPD's reason for his termination was not the actual reason and that MPD intentionally discriminated against him on the basis of his race,

national origin or retaliation, his § 1981 claims concerning his termination must be dismissed.[14]

### 2. Plaintiff's Training and Advancement Claim Fails[15]

Plaintiff has alleged that, in retaliation for engaging in protected activity, he was relegated to only academic work at the academy, made to train with a lower class, subjected to sarcastic remarks about his ability to do his job, and deprived of specialized training (particularly firearms and vehicle skills training). Opposition at 11-12. But these claims fail on the facts and the law.

With respect to being relegated to only academic work at the academy, plaintiff's own deposition testimony is that this was a result of his being placed in a limited duty status based first on his shoulder injury and later on his asthma (based on his personal doctor's recommendation). Depo. Vol. II at 130-33; 177-78; 201-05; 211-13. And, as a result, his cadet class advanced beyond him and he fell behind to subsequent cadet classes. *Id.* In his deposition testimony, plaintiff acknowledged that being relegated to only academic work and, as a result, falling behind one's cadet class, was the logical consequence of being placed on limited duty which decision was based on medical advice. *Id.* Accordingly, plaintiff has presented no evidence (beyond conclusory allegations) that these acts were based on a desire to retaliate against him.

With respect to the allegation concerning being subjected to sarcastic remarks, this claim too fails on the facts. At his deposition, plaintiff was unable to provide any information about that claim. Depo. Vol. II at 213. As such, no evidence supports it. And this claim fails on the

---

[14]     And, as previously stated, the same analysis would also doom any of plaintiff's Title VII claims had they been timely or properly exhausted.

[15]     As set forth above, plaintiff's training and advancement claim fails because he has failed to satisfy the *Monell* standard. *See supra* pp. 17-18. But the Court analyzes the merits as an alternative basis to dismiss these claims.

law as well because being subjected to sarcastic remarks does not rise to the level of material

adversity on which a retaliation claim may be based.  *See, e.g.*, *Taylor*, 571 F.3d at 1321

(employer's criticism of plaintiff for exhibiting "negative behaviors" was not a materially

adverse action because petty slights and minor annoyances would not deter a reasonable

employee from making a charge of discrimination); *Baloch*, 550 F.3d at 1199 (supervisor's

alleged profanity-laden yelling does not meet the requisite level of regularity or severity to

constitute material adversity because the Supreme Court has emphasized that sporadic verbal

altercations or disagreements do not qualify as adverse actions for purposes of retaliation

claims).

Finally, plaintiff claims that he was denied specialized training (particularly firearms and

vehicle skills training) in retaliation for his complaints of discrimination.  But, even according to

his own testimony, he was not denied such training; he was simply told he had to first complete

his physical training before he could receive the specialized training.  Depo. Vol. II. at 132-36.

So, in fact, it was not so much a *denial* of training; instead it was a decision on which *order*

plaintiff would receive his training (the entire academy involves training).  Plaintiff argues that

the denial of this training was materially adverse because such training was integral to being a

police officer and the denial of such would affect his future employment with MPD.  Opposition

at 11-12.  But, at this point in time, plaintiff had not completed his physical training and, in fact,

never did complete it.  Absent completing the physical training, plaintiff could never become a

police officer.  Thus, under these facts, the Court concludes that MPD's decision to postpone the

specialized training until plaintiff completed his physical training was not materially adverse

because it, in fact, did not materially change his employment conditions, status or benefits and

not receiving such training did not result in objectively tangible harm to *this* plaintiff.[16] *Allen v. Napolitano*, 774 F. Supp. 2d 186, 204 (D.D.C. 2011); *see also Dorns v. Geithner*, 692 F. Supp. 2d 119, 132 (D.D.C. 2010) (employer's refusal to allow plaintiff to attend four training courses was not materially adverse because plaintiff failed to demonstrate that the denial produced any adverse consequences in her employment status, conditions, or benefits); *Powell v. Castaneda*, 247 F.R.D. 179, 183-84 (D.D.C. 2007) (denial of a training session was not materially adverse because such a minor inconvenience would not deter a reasonable employee from making or supporting a charge of discrimination).

Accordingly, plaintiff's allegations pursuant to § 1981 that, in retaliation for engaging in protected activity, he was relegated to only academic work at the academy, made to train with a lower class, subjected to sarcastic remarks about his ability to do his job, and deprived of specialized training (particularly firearms and vehicle skills training) fail on the facts and the law. Consequently, they will be dismissed.

## IV.  CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is granted in part and denied in part. Plaintiff's discrimination and retaliation claims based on Title VII and 42 U.S.C. §§ 1981 & 1983 are dismissed. Plaintiff's Fifth Amendment and 42 U.S.C. §§ 1983 due process claims based on a purported property interest are also dismissed. The Court requests supplemental briefing only on plaintiff's Fifth Amendment and 42 U.S.C. §§ 1983 due process claim based on a purported liberty interest. An Order consistent with this Memorandum Opinion

---

[16]     Obviously, not having received this specialized training had nothing whatsoever to do with plaintiff's termination or his failure to graduate from the academy and become a police officer.

is separately and contemporaneously issued this 9th day of November, 2012.


RUDOLPH CONTRERAS
United States District Judge